## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**FRANTISEK PRIBYL**

   **Plaintiff,**

**vs.**                              **CASE NO. 4:18-CV-00349-WS-MAF**

**R.E. COIL,**
**Warden, FDC Tallahassee,**
**et al.,**

   **Defendant.**
**_____/**

## REPORT AND RECOMMENDATION

   This Cause is currently before the court upon the motion for summary

judgment filed by Defendants David Arnold and John Pritt. ECF No. 133.

Plaintiff, Frantisek Pribyl, was a pretrial detainee at the time of the alleged

violations and initiated this civil rights action pursuant to Bivens v. Six

Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388

(1971).[1] ECF No. 1. The second amended complaint is the operative

complaint. ECF No. 38. Pribyl's Fifth- and Eighth Amendment claims against

---

[1] Pribyl was housed at the Federal Detention Center (FDC) Tallahassee from February 13, 2017, until August 14, 2017, and again from January 3, 2018, through November 1, 2018. ECF No. 133-7, pp. 1-2. During the interim, Pribyl was at the Federal Correctional Institution in Miami ("FCI Miami"). Id. Pribyl's claims stemming from events which allegedly occurred outside of the period from January 2018 through November 2018 were previously dismissed.

Defendants Arnold, Willingham[2], Pritt, and Coil remain. Also, Pribyl's claims against Defendant Arnold for interference with his religious exercise were also allowed to proceed. ECF Nos. 94 and 101.

The court provided Pribyl numerous opportunities to respond to the motion for summary judgment. ECF Nos. 142, 153, and 164. Eventually, Pribyl filed two short documents entitled "Introduction"; neither contained a sworn signature. ECF Nos. 165 and 166. After careful review, for the reasons stated below, Defendants' motion for summary judgment should be GRANTED; the case against Defendant Coil should be DISMISSED pursuant to Fed. R. Civ. P. 4(m) for failure to timely serve; and the case against Defendant Willingham should be DISMISSED for failure to state a claim.

## I.    Pribyl's Claims Against Defendants Arnold and Pritt, ECF No. 38

In the second amended complaint, Pribyl alleged that Arnold, Pritt, Willingham, and Coil were deliberately indifferent to his serious medical needs during 2017 and 2018; however, only some claims survived.[3]

---

[2] Jaleesa Willingham was substituted for the initial defendant Pribyl incorrectly named as "Mrs. Williams." ECF No. 162. Willingham was identified during the attempts to serve the complaint. See ECF No. 145 Plaintiff also named two "John Does" who were dismissed from the case. ECF No. 94.

[3] This case was initiated nearly four years ago. ECF No. 1. It took Plaintiff one year to submit a legally sufficient complaint. ECF No. 38. Only Defendant Arnold was served before a motion to dismiss was filed. ECF No. 69. After the motion to dismiss was

ECF No. 38. Pribyl did not indicate whether he was suing Defendants in their individual- or official capacities. Id., pp. 2-3. As a *pro se* litigant, Pribyl is entitled to liberal construction. Mederos v. United States, 218 F.3d 1252, 1254 (11th Cir. 2000) (citing Haines v. Kerner, 404 U.S. 519, 520 (1972)). Thus, the complaint was construed as suing Defendants in both capacities. Pribyl's claims were outlined in a prior report[4] later adopted by the court. ECF Nos. 94 and 101. Only the surviving claims are repeated here.

Pribyl alleged he was at FDC Tallahassee from February 2017 through November 1, 2018, which is clearly inaccurate now. ECF No. 38, p. 15. He now alleges he was at "FDC Miami" in November 2017. Id. Allegedly, Pribyl was returned to FDC Tallahassee with a serious skin condition that was "never . . . complete[ly] treated"; his "hundreds [of] skin sor[es]" were itching and "bleeding" continuously until the time he filed his amended complaint.[5] Id., p. 15. During 2018, Pribyl's complaints of his skin condition to the warden, a doctor, and Arnold were repeatedly ignored. ECF No. 38, p. 16. Pribyl had developed a staph infection, which, allegedly, continued through the date of the operative complaint. Id., p. 17. According to Pribyl, Arnold

---

resolved, Pritt and Willingham waived service on July 28, 2021, and December 14, 2021, respectively. ECF Nos. 108 and 147.

[4] The Report addressed Defendant Arnold's earlier motion to dismiss.

[5] Pribyl filed his operative complaint in July 2019. ECF No. 38.

placed him in the Special Housing Unit (SHU) from July 10 through July 28, 2018, to punish, harass, humiliate, and discriminate against him. Id., p. 5.

Pribyl also alleged that Willingham purposefully shut off the water supply in the SHU from July 11 through July 16, 2018, and that she ensured the water remained off during this time. Id., p. 5. Pribyl could not flush the toilet, use the shower, or drink water. Id., p. 6. Given Pribyl's staph infection, the denied access to water left him unable to perform any hygienic task. Id. This, coupled with the smell from the toilet, was physical and psychological torture so that Pribyl required psychiatric medications. Id., pp. 5-6. Pribyl complained, but Willingham had assistance in ensuring Pribyl's water remained turned off. Id., p. 5. Pribyl claims this amounted to "denied life support . . . and [was an] attempt to kill" him. Id., p. 6.

For two days, on July 12 and July 13, Pribyl reported the situation to Arnold and Pritt, who was the unit manager, and asked for help. Id., p. 6. Arnold ignored Pribyl and walked away. Id. Pritt directed Pribyl to report the issue to the SHU lieutenant. Id. Next, on July 13 or July 14, Pribyl sent a letter to the warden, Defendant Coil, about the denial of water and asked for help, but Pribyl was ignored and received no response. Id. Eventually, on July 16, an unknown prison official restored Pribyl's access to water. Id.

Afterward, Pribyl was subjected to continued harassment, verbal abuse, and "constant religious attacks" by Arnold. Id., p. 18. Arnold told Pribyl to cover up or remove his cross necklace. Id. On multiple occasions, Arnold called the necklace, "shit" and said he never wanted to see it again. Id. Pribyl asked the prison priest for help but was told he could do nothing to stop Arnold because it would just be "cover[ed] up." Id., pp. 18-19. Pribyl claims he suffered from nightmares because he felt "hunted and targeted." Id., pp.18-19.

Pribyl alleged the religious harassment against him continued through November 1, 2018. Id., p. 19. Arnold kicked the cross, ordered Pribyl to put it away, and regularly interrupted Pribyl during prayer "with nasty comments." Id. Arnold threatened Pribyl, "I'll tell you what will happen next to you, you will go under the ground and never see the sun or your children or family [or] daughter ever again!!!" Id. Pribyl believes these personal attacks and threats were retaliation for filing complaints against Arnold. Id. Pribyl asked other correctional officers for help, but was told "be quiet," "do not complain," and warned about the "potential danger" for filing complaints against Arnold, as if these officers feared Arnold. Id., p. 20.

Pribyl seeks as relief $300,000 in damages, court fees, and expenses related to the lawsuit. Pribyl's requests for other forms of injunctive relief

were previously dismissed under <u>Heck v. Humphrey</u>, 512 U.S. 477 (1994) and for lack of standing. <u>See</u> ECF Nos. 94 and 101.

## II.    Defendants' Motion for Summary Judgment, ECF No. 133.

Arnold and Pritt argue they are entitled to summary judgment as a matter of law because there are no genuine disputes of material facts. ECF No. 133. They make several arguments. First, Defendants maintain that the official capacity claims are barred by sovereign immunity under <u>FDIC v. Meyer</u>, 510 U.S 471, 483-86 (1994). <u>Id.</u>, p. 2.

Second, Defendants argue that the complaint should be dismissed because Pribyl failed to exhaust his administrative remedies. <u>Id.</u>, pp. 12-19. The Prison Litigation Reform Act (PLRA) mandates that inmates exhaust *before* filing a suit challenging prison conditions. <u>Id.</u>, p. 12. Defendants rely on <u>Abram v. Leu</u>, 848 F. App'x 868 (11th Cir. 2021) and other cases, and suggest Pribyl's "unverified claims that he was prevented access to forms" do not demonstrate administrative remedies were unavailable to him. <u>Id.</u>, pp. 16, 18. Defendants maintain that Plaintiff could have filed remedy requests after he transferred to another institution, on November 1, 2018. <u>Id.</u>, pp. 16-17. Still, the court is aware that Pribyl initiated this case while in the SHU, four months before his transfer.

Third, Defendants maintain that Pribyl's claims fail because they are controverted by the record. Id., pp. 19-38. Pribyl's claims for deliberate indifference to a serious medical need are reviewed under the Due Process Clause of the Fifth Amendment rather than the Eighth Amendment because he was a pretrial detainee at the time. Id., p. 19. Defendants argue that the medical records contradict Pribyl's claims that his requests for medical care were ignored while housed at FDC Tallahassee. Id., pp. 24-28.

Defendants argue that no facts support Pribyl was without water for five days while in the SHU. Id., p. 21. Pribyl did not raise the issue at his disciplinary hearing, or when he went to health services, or when health services visited him in the SHU, or after he was transferred to another institution. Id., pp. 22-23. Defendant Pritt acknowledges that Pribyl informed him once that the water in the SHU was not working. Id.

Finally, Defendants argue that Pribyl's religious interference claims fail because he has not shown there was any adverse effect on protected speech or that the conduct was retaliatory in nature. Id., p. 29. Bivens relief is not available for First Amendment retaliation claims. Claims under RLUIPA also fail because the statute creates a cause of action against the states and not the federal government or its employees. Id., pp. 32-33. To the extent Pribyl's claims could be construed under the Religious Freedom Restoration

Act (RFRA), they would still fail because he cannot demonstrate that his religious exercise was substantially burdened by the policy. Id., pp. 33-38.

### III.   Pribyl's Opposition, ECF Nos. 165 and 166.

Pribyl filed two documents entitled "Introduction" to oppose the motion for summary judgment. ECF Nos. 165 and 166. Contextually, at just under two pages each, the two documents are identical. Id. The document filed as ECF No. 165 is not signed as required by N.D. Fla. Loc. R. 5.1(E); therefore, it will not be considered.

The other filing contains Pribyl's unsworn signature. ECF No. 166. Pribyl does not respond to Defendants' statement of facts as required by N.D. Fla. Loc. R. 56.1(C). ECF No. 166. He makes only general statements: (1) the summary judgment motion "remains a mystery", (2) it is "a miscellany of sworn and unsworn statements" and "unconventional," and (3) the motion should be denied because it "is devoid of substantive legal reasoning and argument" and "rife with substantive and procedural deficiencies." ECF No. 166, p. 1. Pribyl stresses that Defendants failed to address the actions of Coil and Willingham; however, Pribyl ignores the reality that Coil was never served in this case and Willingham was only served *after* the motion for summary judgment was filed. Id., p. 2. Pribyl provides no supporting facts, evidence, affidavits, or depositions. Instead, he relies on his complaint.

Because Pribyl's filing fails to properly address Defendants' factual assertions and supporting evidence, the court "may consider the[se] facts undisputed for the purposes of the motion." Fed. R. Civ. P. 56(e)(2). As set forth below, the motion and supporting materials show Defendants are entitled to summary judgment. Fed. R. Civ. P. 56(e)(3).

## IV.   Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is proper:

> [i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

Accordingly, summary judgment should be entered only against

> a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (citations omitted).

Thus, pursuant to <u>Celotex</u> and its progeny, a movant for summary judgment bears the initial responsibility of informing the court of the basis for the motion by identifying those parts of the record that demonstrate the nonexistence of a genuine issue of material fact. This demonstration need not be accompanied by affidavits. <u>Hoffman v. Allied Corp.</u>, 912 F.2d 1379, 1382 (11th Cir. 1990). If the party seeking summary judgment meets the initial burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the non-moving party to present sufficient evidence to rebut this showing with affidavits or other relevant and admissible evidence. <u>Avirgan v. Hull</u>, 932 F.2d 1572, 1577 (11th Cir. 1991).

It is the non-moving party's burden to come forward with evidence on each essential element of his claim sufficient to sustain a jury verdict. <u>Earley v. Champion Int'l Corp.</u>, 907 F.2d 1077, 1080 (11th Cir. 1990). The non-moving party cannot rely solely on his complaint and other initial pleadings to contest a motion for summary judgment supported by evidentiary material, but must respond with affidavits, depositions, or otherwise show there are material issues of fact which demand a trial. Fed. R. Civ. P. 56(e); <u>Coleman v. Smith</u>, 828 F.2d 714, 717 (11th Cir. 1987). The trial judge, at the summary judgment stage, does not weigh the evidence but rather determines whether there is a genuine issue for trial: "if the evidence is merely colorable, or is not

significantly probable, summary judgment may be granted." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986); <u>Baldwin Cty., Ala. v. Purcell Corp.</u>, 971 F.2d 1557, 1563 (11th Cir. 1992). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." <u>Walker v. Darby</u>, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing <u>Anderson</u>, <u>supra</u>).

The Supreme Court has stressed:

> [w]hen the moving party has carried its burden under rule 56(c) its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'

<u>Matasushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986) (footnote omitted). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." <u>Anderson</u>, 477 U.S. at 247-48. Finally, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007).

## V.   Discussion

### A. Failure to Exhaust Administrative Remedies

Defendants seek dismissal based on failure to exhaust. ECF No. 133. More than one year ago, on June 22, 2021, the court denied Defendant Arnold's motion to dismiss for failure to exhaust administrative remedies. See ECF Nos. 69, 94, and 101. At that time, Arnold did not provide any copies of the grievances filed. Id. After reviewing the pleadings and exhibits, including the grievance log and Mr. Littlejohn's declaration, the court rejected the argument and determined that Pribyl made numerous informal attempts to present his complaints to Defendants and prison officials; was denied the proper forms to file a grievance; waited for responses to his complaints; and was threatened, punished, and intimidated in retaliation for his complaints. ECF No. 94. Pribyl did not have meaningful access to the grievance system. ECF Nos. 94 and 101. Arnold did not object to the report and recommendation, did not file a motion to reconsider the order adopting the report, and did not further appeal the decision.

Subsequently, Arnold and Pritt filed their answers and raised failure to exhaust as an affirmative defense. ECF Nos. 108 and 113. The instant

motion for summary judgment repeats the exhaustion defense -- now with additional exhibits.[6] ECF No. 133.

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The exhaustion requirement "is an affirmative defense," that is properly "raised in a motion to dismiss under Rule 12(b)." Bryant v. Rich, 530 F.3d 1368, 1374-75 (11th Cir. 2008); Jones v. Bock, 549 U.S. 199, 216 (2007) (quoted in Brooks v. Warden, 706 F. App'x 965, 968 (11th Cir. 2017)).

Rule 12(g)(2) of the Federal Rules of Civil Procedure limits "defenses that can be raised for the first time in a second or successive motion to dismiss under Rule 12." Brooks, 706 F. App'x at 968. "Specifically, the rule says: 'Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion.'" Fed. R. Civ. P. 12(g)(2) (quoted in Brooks, 706 F. App'x at

---

[6] Willingham eventually waived service on December 14, 2021; so, she did not join in the motion for summary judgment. ECF No. 147. Then, Willingham filed her answer on February 14, 2022, but no dispositive motion was filed on her behalf. ECF No. 161.

968). Thus, "a party cannot raise a defense in a second Rule 12 motion that it failed to raise in its first Rule 12 motion." <u>Brooks</u>, 706 F. App'x at 968; <u>see also</u> <u>Ford v. Hayes</u>, No. 3:15-CV-907-J-32JRK, 2018 WL 3831167, at *6, n.8 (M.D. Fla. Aug. 13, 2018) (defendants "forfeited the right to raise the defense in a subsequent motion" to dismiss); <u>Oliver v. Whitehead</u>, No. 3:14-CV-1506-J-39JRK, 2017 WL 5187752, at *2 (M.D. Fla. Nov. 9, 2017) (rejecting exhaustion defense raised in summary judgment motion because it was not raised in prior motion). Moreover, a party is not entitled to multiple bites at the same apple. "The policy behind Rule 12(g) is to prevent piecemeal litigation in which a defendant moves to dismiss on one ground, loses, then files a second motion on another ground.'" <u>Ennenga v. Starns</u>, 677 F.3d 766, 773 (7th Cir. 2012) (quoted in <u>Brooks</u>, 706 F. App'x at 969).

It appears that Defendants' first affirmative defense lacks merit because this issue was already raised and rejected. Defendants' request for dismissal on this basis should be DENIED. Having raised the defense in a motion to dismiss and failed to support that argument with evidence, they do not get to revisit the issue again.

B. <u>Claims Barred under Bivens</u>

Defendants argue that Plaintiff's official capacity claims are barred by sovereign immunity. ECF No. 133, p. 2. They rely on <u>FDIC v. Meyer</u>, 510

U.S 471, 483-86 (1994). Id. Pribyl submitted no counter argument. In the operative complaint, Pribyl did not indicate whether he was suing defendants in their individual or official capacities. ECF No. 38. Because Pribyl is proceeding *pro se*, his complaint was construed liberally to include official capacity claims. ECF Nos. 94 and 101. See Haines v. Kerner, 404 U.S. 519, 520 (1972). Neither party objected. Nonetheless, Defendants are correct. "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suits; sovereign immunity is jurisdictional in nature." FDIC v. Meyer, 510 U.S. at 475 (citing Loeffler v. Frank, 486 U.S. 549, 554 (1988)). "The United States simply has not rendered itself liable . . . for constitutional tort claims." Id., at 478. Pribyl's official capacity claims also fail under Bivens. The purpose of Bivens is to deter the officer. See Carlson v. Green, 446 U.S. 14, 21 (1980). Accordingly, the official capacity claims against all Defendants warrant dismissal.

Similar reasoning applies to some of Pribyl's other claims. Defendants correctly argue that Plaintiff's First Amendment claims are barred under Ziglar v. Abbasi, 582 U.S. ___, ___, 137 S. Ct. 1843, 1848 (2017). ECF No. 133, p. 29. The Eleventh Circuit refused to extend Bivens to First Amendment claims. See Johnson v. Burden, 781 F. App'x 833, 836-37 (11th Cir. 2019) (citing Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)); Reichle

v. Howards, 566 U.S. 658, 663 n.4 (2012); Wood v. Moss, 572 U.S. 744 (2014)). In Johnson, supra, the Eleventh Circuit remanded the case to the district court to determine what "special factors," if any, would lead to the expansion of Bivens to First Amendment claims. However, this step is unnecessary in Pribyl's case given the Supreme Court's most recent decision in Egbert v. Boule, 596 U.S. ___, 142 S. Ct. 1793 (June 8, 2022).

Congress enacted 42 U.S.C. § 1983 to "[provide] a specific damages remedy for plaintiffs whose constitutional rights were violated by state officials but provided no corresponding remedy for constitutional violations by agents of the Federal Government." Ziglar, 582 U.S. at ___, 137 S. Ct. at 1848. The Supreme Court "recognized in Bivens an implied damages action to compensate persons injured by federal officers who violated the Fourth Amendment's prohibition against unreasonable searches and seizures." Id. The Court later expanded the holding in Bivens to Fifth Amendment due process gender discrimination and Eighth Amendment cruel and unusual punishment clause cases. See Davis v. Passman, 442 U.S. 228 (1979); Carlson v. Green, 446 U.S. 14 (1980). Since Carlson, however, the Court rejected the expansion of Bivens beyond the specific contexts of Davis and Carlson. See e.g., Egbert, 596 U.S. ___, ___, 142 S. Ct. at 1797 (compiling a list of eleven cases in which the Court refused to expand Bivens).

Generally, a federal court must undergo a two-step analysis to determine if <u>Bivens</u> can be applied to a new claim. <u>See</u> <u>Bush v. Lucas</u>, 462 U.S. 367, 377-78 (1983) (recognizing that the Court in <u>Carlson</u>, <u>supra</u>, identified a two-step analysis by which courts can determine if <u>Bivens</u> applies). "First, we ask whether the case presents 'a new <u>Bivens</u> context'— <u>i.e.</u>, is it 'meaningful[ly]' different from the three cases in which the Court has implied a damages action." <u>Egbert</u>, <u>supra</u>, at 1797 (citing <u>Ziglar</u>, 582 U. S. at ___ (slip op., at 16)). "Second, if a claim arises in a new context, a <u>Bivens</u> remedy is unavailable if there are 'special factors' indicating that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed.'" <u>Id.</u> (citing <u>Ziglar</u>, 582 U. S. at ___ (slip op., at 12)).

However, "those steps often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." <u>Id.</u> (citing <u>Hernandez v. Mesa</u>, 589 U.S. ___, ___ (slip op., at 12)). Yet, this begs the question "when might a court ever be 'better equipped' than the people's elected representatives to weigh the 'costs and benefits' of creating a cause of action?" <u>Egbert</u>, <u>supra</u>, at 1809 (Gorsuch, J., concurring in judgment) (slip op., at 2). In <u>Egbert</u>, the Court refused to expand <u>Bivens</u> to a Fourth Amendment excessive-use-of-force claim and a

First Amendment retaliation claim. See Egbert, supra, at 1807. Ultimately, summary judgment on the First Amendment claim is required because Egbert forecloses the claim as a matter of law.

But this is not the end of the inquiry for Pribyl. Congress provided for "an alternative remedial structure" -- the Religious Freedom Restoration Act of 1993, 42 U.S.C.A. §§ 2000bb — 2000bbb-4. When Congress provides an alternative remedial structure, a court "may not fashion a Bivens remedy." Egbert, supra, at 1804 (citing Ziglar, 582 U.S. at ___ (slip op., at 14)). Plaintiff's allegations as they may implicate other statutory frameworks are discussed in greater detail in subsection C below.

## C. Pribyl's RLUIPA and RFRA Claims

Aside from the First Amendment, Plaintiff's operative complaint was liberally construed to include allegations of interference with religious exercise in violation of a statutory framework. ECF Nos. 94 and 101. Congress enacted RLUIPA to provide confined persons greater protection of religious exercise than what the Constitution itself affords under the First Amendment.

Under Section 3 of RLUIPA

no government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution..., even if the burden results from a rule of general applicability, unless the government demonstrates

> that imposition of the burden on that person is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling interest.

42 U.S.C.A. § 2000cc-1(a). However, RLUIPA only "applies to the States and their subdivisions." Holt v. Hobbs, 574 U.S. 352, 357 (2015). Pribyl was and still is confined in a federal correctional facility; therefore, as a matter of law, Pribyl's claim fails under RLUIPA.

"The Religious Freedom Restoration Act of 1993 (RFRA) prohibits the Federal Government from imposing substantial burdens on religious exercise, absent a compelling interest pursued through the least restrictive means." Tanzin v. Tanvir, 592 U.S. ___, 141 S. Ct. 486, 489 (2020). It was enacted "to provide very broad protection for religious liberty." Davila v. Gladden, 777 F.3d 1198, 1203-04 (11th Cir. 2015) (citing Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682, 693 (2014)). RFRA has an express remedies provision, which "permits litigants when appropriate to obtain money damages against federal officials in their individual capacities." Tanzin, 592 U.S. ___, 141 S. Ct. at 493.

Pribyl fails to establish that Arnold's alleged actions substantially burdened his religious exercise. Pribyl did not allege that his religious beliefs required him to wear a religious necklace or that it was part of any religious practice. There is no indication that Pribyl wore the necklace for any other

purpose than to identify himself as a Christian rather than to exercise his faith. See generally, ECF No. 38. Pribyl simply alleged harassment in his complaint. Id. According to Pribyl, Pritt kicked the cross and told him to put it away and made nasty comments. But this without more does not create a genuine issue of material fact that there was any substantial burden on Pribyl's ability to practice his faith.

In a sworn affidavit, Chaplain Dai Mai stated that during his tenure at FDC Tallahassee, he provided Pribyl with a Bible and rosary beads, prayed with Pribyl, and discussed Pribyl's personal issues. ECF No. 133-4, p. 1. The chaplain confirmed that inmates are allowed to wear religious necklaces, but they must be worn inside an inmate's shirt for security reasons. Id. If inmates fail to comply with the rules, then staff is authorized to confiscate the necklace. Id., p. 2. According to the chaplain, inmates can make their own necklaces using hobby craft materials, but those must be mailed home once completed; and Pribyl did not make a purchase for any religious necklace via his trust fund. Id. If such items are obtained outside these two sources or the chaplain's office, it is considered contraband. Id. Defendants Pritt and Arnold confirmed in their sworn affidavits that inmates are required to wear religious necklaces inside their shirts; and such necklaces made of hobby craft material must be mailed home upon completion. ECF No. 133-9, p. 3; ECF

No. 133-10, p. 4. Arnold recalls Pribyl made a crucifix necklace out of pieces of a torn t-shirt and bedsheet. ECF No. 133-10, p. 4. The chaplain cannot confirm that Pribyl obtained the necklace from an authorized source. ECF No. 133-4, p. 2.

Still, Pribyl did not allege that his necklace was confiscated only that Arnold told him he did not want to see it. ECF No. 38, p. 18. This is consistent with the regulation that the necklace be worn on the inside of the inmate's shirt. In his sworn affidavit, Arnold denies mocking Pribyl's religion, discouraging him from wearing the necklace, or confiscating the necklace. ECF No. 133-10, p. 4. Pribyl provided no argument or evidence contrary to Defendants' position. Unfortunately, Pribyl has not met his burden to come forward with evidence on each essential element of his claim sufficient to sustain a jury verdict. Earley, 907 F.2d at 1080. Pribyl does not show there are genuine material issues of fact which demand a trial. Fed. R. Civ. P. 56(e). Accordingly, summary judgment in favor of Defendants is appropriate.

D. Deliberate Indifference to a Serious Medical Need

There is an "obligation to provide medical care for those who are incarcerated whom it is punishing by incarceration." Estelle v. Gamble, 429 U.S. 97, 103-05 (1976). Delayed or denied access to medical care for inmates resulting in physical or mental injury constitutes a violation of

constitutional rights under the Eighth Amendment. Id. To sufficiently state a claim, a plaintiff must allege facts that plausibly show: (1) the plaintiff had a serious medical need; (2) the defendant was deliberately indifferent to that need; and (3) there is a causal connection between that indifference and the plaintiff's injury. Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1306-07 (11th Cir. 2009). The medical need must be "one that, if left unattended, pos[es] a substantial risk of serious harm." Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003) (citations and internal quotation marks omitted). "However, not 'every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment.'" McElligott v. Foley, 182 F. 3d 1248, 1254 (11th Cir. 1999).

A deliberate-indifference claim contains an objective- and a subjective component. Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004). First, the prisoner must prove the need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention," which "if left unattended, poses a substantial risk of serious harm." Id.

Second, the prisoner must prove the defendant had (1) subjective knowledge of a risk of serious harm; (2) disregarded that risk; and (3) by conduct that is more than mere negligence. Id. (citing McElligott v. Foley,

182 F.3d 1248, 1255 (11th Cir. 1999)). The subjective component requires the plaintiff to demonstrate that the prison officials acted wantonly, with deliberate indifference to the plaintiff's serious needs. See Farmer v. Brennan, 511 U.S. 825, 834 (1994); Wilson v. Seiter, 501 U.S. 294, 298-99 (1991).

Defendants maintain that, given Plaintiff's pretrial detainee status, his deliberate indifference claims are predicated on the substantive due process clause of the Fifth Amendment rather than the Eighth Amendment. ECF No. 133, pp. 19-21. Still, the applicable standards are the same. Under both clauses, Pribyl must show that officials remained deliberately indifferent to his serious medical needs. See Estelle v. Gamble, 429 U.S. 97, 104 (1976). Defendants never contested Pribyl's Fifth Amendment claims as creating a new context under Bivens; therefore, the Court need not address the issue.[7] See Fils v. City of Aventura, 647 F.3d 1272, 1284 (11th Cir. 2011) ("[D]istrict courts cannot concoct or resurrect arguments neither made nor advanced by parties."). Nonetheless, summary judgment for Defendants is also appropriate if Pribyl's deliberate indifference claims are controverted by the record and he relies solely on his complaint.

---

[7] Under Egbert v. Boule, supra, Plaintiff's status as a pretrial detainee may call into question whether deliberate indifference claims under the Fifth Amendment expands Bivens to a new context.

1. <u>SHU Conditions</u>

No facts support Pribyl's claim that he was without access to water for five days. Defendants Pritt and Arnold submitted sworn affidavits refuting the allegations. ECF Nos. 133-9, 133-10. According to Defendant Pritt, Pribyl was placed in the SHU for receiving an incident report charging he failed to keep his cell clean. ECF No. 133-9, p. 1. Defendant Arnold admitted the incident reports were submitted for two reasons: (1) an unclean and untidy cell and (2) disruptive conduct. ECF No. 133-10, p. 2. The disciplinary record confirms the charges. ECF No. 133-3, pp. 1-2. Pribyl's disciplinary hearings were on July 17th and 18th; and he was found guilty. <u>Id.</u> Arnold did not participate in the decision-making process. <u>Id.</u>, pp. 1-2. For the violations, Pribyl lost his email and commissary privileges for thirty days. <u>Id.</u> Pribyl remained housed in the SHU from July 10th through July 28th. <u>Id.</u>

Pritt does not know of any instance where water was shut off as a punitive measure because it would violate BOP protocols. ECF No. 133-9, p. 2. Pribyl never reported the deprivation of water to Pritt but, on one occasion, did report that the water was not working. <u>Id.</u> Pritt asked the SHU officer to check the valve controlling water flow to the cell and determine if it was closed. <u>Id.</u> The valve was in the "on" position. <u>Id.</u> Pribyl made no further allegation that the water was off. <u>Id.</u> Defendant Arnold maintains that Pribyl

never informed him of the water outage; and no water outage was apparent to Arnold. ECF No. 133-10, p. 2.

According to Pritt, Pribyl must have had to have access to water because, during July 2018, the SHU inmates received dry packets of powder to mix with water to create punch. ECF No. 133-9, p. 2. It would be impossible for Pribyl to make a drink if access to water was denied; and, after five days, a deterioration in his health would have been evident. Id. Pritt made regular rounds to check on SHU inmates and habitually carried a folder with grievance forms. Pribyl never asked Pritt for a form. Id. Even though Pribyl was in the SHU, health services visited him on July 17th, but he did not report denied access to water and had no signs of severe distress or dehydration. Id.; ECF No. 133-10, p. 3.

2.  Pribyl's Medical Records

Pribyl's medical records prior to his return to FDC Tallahassee are relevant because they contradict his claims that he arrived with "hundreds [of] itching and "bleeding" "skin sor[es]," which continued until the time he filed his amended complaint.[8] ECF No. 38, p. 15. During 2017, Pribyl's skin

_____

[8] Pribyl claimed that FCI Miami "never . . . complete[ly] treated" him for the condition. ECF No. 38, p. 15.

condition was regularly "within normal limits" and had no "draining skin lesions." ECF No. 133-1, pp. 68, 88, 94, 101, 104, and 110.

On October 3, 2017, Pribyl saw Dr. Gonzalez for a mental health appointment. ECF No. 133-1, pp. 20-21. He had no other complaints and was diagnosed with adjustment disorders, mixed anxiety, and depressed mood and was prescribed medications. Id., p. 20. On October 23, Pribyl visited the chronic care clinic complaining of depression, itching after starting Celexa, poor sleep and concentration. Id., p. 12. He was diagnosed with unspecified dermatitis and was prescribed medication and injections. Id. The same day, Pribyl was treated for hypertension. Id., pp. 14-16. It was noted that Pribyl had macules on his skin located on the "Antecubital Space, Anterior Upper Arm, Posterior Upper Arm, Anterior Forearm, Posterior Forearm." Id., p. 14. He was referred to the psychiatrist for a possible allergy to Celexa. Id., p. 15. On October 31, at a mental health visit, Pribyl complained about itching skin; however, the doctor noted there was no rash, there was redness from scratching himself, and he did not show up for the Benadryl injections. Id., p. 8. About one month later, on November 21, Pribyl reported a rash that was "non-weeping." Id., p. 5. He was treated for dermatitis with medication and a diphenhydramine injection. Id., pp. 5-7.

In an affidavit, Dr. John Meade, the clinical director of FDC Tallahassee, outlined Pribyl's medical history and certified the accuracy of the medical records. ECF No. 133-7, pp. 1-4. Pribyl had a history of malingering while at FCI Miami. ECF No. 133-7, pp. 1-2. Several medical records indicate the same. Id., pp. 120, 140, 158, 208, 218, 220, 230, 345, 347, and 349. Dr. Meade stated that Pribyl was not denied health care during his time at FDC Tallahassee; in fact, he had numerous visits to health services after arriving.

At a health screening upon his arrival on January 3, 2018, Pribyl did not report any ongoing condition. ECF No. 133-7, p. 2. Specifically, the medical report noted there were no draining skin lesions. ECF No. 133-1, p. 83. According to Dr. Meade, on January 16, Pribyl had a "chronic care" appointment but did not report any skin condition or pain; he had hypertension, mental health issues, and refused treatment for latent tuberculosis (TB). ECF No. 133-7, p. 2. The medical record confirms that Dr. Jimenez assessed Pribyl for hypertension, latent TB infection (LTBI), anxiety disorder, and depressed mood. ECF No. 133-1, pp. 1-4. All other body systems were "within normal limits." Id. Pribyl was prescribed medications. Id.

Pribyl had other health appointments at FDC Tallahassee during 2018: April 6, May 15, July 17, July 20, October 1, and November 1, 2018. ECF No. 133-7, p. 2. On at least one occasion, Pribyl refused to appear for a scheduled appointment. ECF No. 133-10, p. 3. When Pribyl presented for medical appointments on April 13 and June 13, he offered the health care provider a written statement that he was advised by his attorney not to speak English to staff and made multiple complaints but none were for a skin condition. ECF No. 133-7, p. 3. Then, on May 15, 2018, Pribyl complained about an infection on his arm which began just three- to five days earlier. Id. The record indicates that Pribyl reported "a big growth on [his] left armpit." ECF No. 133-1, p. 214. Pribyl was treated for the cyst, which tested positive for a staph infection. Id., p. 215; ECF No. 133-7, p. 2. Pribyl was scheduled for a follow-up appointment on June 7, but he refused it and did not complain again about his skin condition until October 1, 2018, which is long after his release from the SHU. ECF No. 133-7, p. 2.

Dr. Meade maintains that a denial of access to water for five days would result in a person likely experiencing dry mouth, urinating and sweating less than usual, dark-colored urine, dry skin, feeling tired, and dizziness; but Pribyl did not exhibit nor did he report these symptoms. ECF No. 133-7, p. 3. This is particularly significant given that health services

personnel regularly make rounds through the SHU and would have been aware of Pribyl's condition. During dental visits on April 6 and July 20 (an appointment during his time in the SHU), Pribyl did not complain about any other medical issues and denied any pain. ECF No. 133-7, p. 3. Pribyl was also treated regularly by psychological services and did not raise these complaints. ECF No. 133-7, p. 3.

Contrary to his allegations, Pribyl received medical treatment during his time in the SHU. On July 11, allegedly the first day of water deprivation, psychological services made SHU rounds, "observed" Pribyl "sleeping in his cell," and asked him if he required any services; Pribyl declined the offer. ECF No. 133-8, p. 26; ECF No. 133-7, p. 4. On July 17, the day after the alleged water deprivation ended, Pribyl went to a chronic care appointment at health services. ECF No. 133-8, p. 9. All body systems were "within normal limits." Id. He did not allege severe deprivation or acute distress and his hypertension and mental health were listed as stable. ECF Nos. 133-8, pp. 9-11; 133-7, p. 3. The next day, July 18, psychiatric health services again conducted SHU rounds and interviewed Pribyl at his cell door. ECF No. 133-8, p. 25. Pribyl "denied significant problems associated with his placement in SHU . . . denied current psychological distress or symptoms

and none were observed." Id.; ECF No. 133-7, p. 3. Notably, the medical

report states:

> Inmate PRIBYL is currently assigned CARE1-MH status. During SHU rounds, his mood is typically depressed with congruent affect. He regularly presents as frustrated and emotional, although his tearfulness does not appear to be genuine. He sometimes appears to be attempting to engage in manipulation to influence his treatment and placement in SHU. Staff have not reported any problems, adjustment issues, or apparent signs of mental illness with inmate PRIBYL since he has been housed in SHU. There is no evidence to suggest any impaired functioning. Inmate PRIBYL has been offered Turning Point materials. He is managing his time by completing stress management activities, reading, and writing. Psychology staff will continue to make contact with inmate PRIBYL during regular SHU rounds.

Id. The medical record outright refutes Pribyl's assertions: (1) he was not

denied medical care while in the SHU or otherwise and (2) the conditions

were not a substantial risk to his health. He never had hundreds of open

sores. He was regularly monitored by health services and never complained

that cell conditions contributed to or aggravated a skin condition.

Dr. Meade stated that, on October 1, Pribyl complained of a rash all

over his body but this was an exaggeration. The attending physician found

just two small lesions on his arm which appeared to be bruises. ECF

No. 133-7, p. 2. By that time, Pribyl was out of the SHU for months. The

record confirms Dr. Meade's statement. Pribyl reported a rash lasting "for a

few weeks," "large colored bumps which itch continuously . . . all over his body, especially in his upper extremities." ECF No. 133-1, p. 203; ECF No. 133-8, p. 4. However, there were only:

> 2, 2 mm lesions on the right arm which appear to be tiny bruises but they are so small unable to tell what these lesions are, no erythema, MLP checked both upper extremities, lower legs from 6 cm above knees to feet, upper anterior and posterior shoulders, neck, face, head and no other ecchymosis/bruises or other skin lesions present.

ECF No. 133-8, p. 5. Since it could be caused by dry skin, over-the-counter treatments were recommended. ECF Nos. 133-7, p. 3; 133-1, p. 205.

By November 1, 2018, Pribyl denied he had any draining skin lesions or wounds. ECF No. 133-1, p. 201. But on November 7, 2018, while at FDC Atlanta, he complained of "intermittent vague generalized body pain and skin itching." ECF No. 133-1, p. 320. Upon examination, his skin was "within normal limits" and was "intact"; there were no "rashes or excoriations seen." Id., pp. 320-21. Similarly, two weeks later, he had no draining skin lesions. ECF No. 133-1, p. 340.

Pribyl was transferred to other BOP facilities; and those medical records contradict his assertions that he continued to suffer from infected skin sores resulting from denied medical care during his incarceration. See ECF No. 38, p. 17. In January, April, and May 2019, Pribyl had "no skin

problems" and no draining skin lesions. ECF No. 133-1, pp. 273, 276, 283, 293, 310, 326, and 333. On June 11, 2019, he reported a rash on his stomach with "burning pain . . . for over 8 days now." ECF No. 133-1, p. 265. Examination revealed "the lesions are hive like and have no openings. No blisters noted. The skin is slightly red in the circular area." Id. A week later, Pribyl reported a skin problem that allegedly started two weeks earlier – a "bump with a stabbing pain . . . swollen by my waist . . . the pain is just about gone now." ECF No. 133-1, pp. 259-60. The small lesion was "pink and non-tender." Id. On November 28, 2019, Pribyl's skin was "within normal limits." ECF No. 133-1, p. 483. In April 2020, he had no draining skin lesions. ECF No. 133-1, p. 498.

On November 9, 2020, Pribyl was evaluated and denied any painful conditions; there were no signs of skin lesions, wounds, or open sores, but there was a rash. ECF No. 133-1, pp. 585-86. Then, on November 10th and November 12th, Pribyl complained of a rash on his wrist and left knee; he said he had it for a few months; no other areas had a rash. ECF No. 133-1, pp. 574, 577-78. On November 19, 2020, he complained of dry rashes but said it did not itch. ECF No. 133-1, p. 571. The medical records indicate that Pribyl developed a "nonspecific skin" rash more recently, in June 2021. ECF No. 133-1, pp. 140, 230, 370, 515, 553, and 605. He was treated for all

complaints with prescriptions, counseling, and his room was sanitized. Although Pribyl was diagnosed with scabies, at one point, he was also found to be malingering. ECF No. 133-1, p. 579.

Pribyl's claims that he was denied medical care, had hundreds of open sores all over his body, or was denied adequate access to water in the SHU are so blatantly contradicted by the record that no reasonable jury could believe Pribyl's version of the facts. Scott, 550 U.S. at 380. The record supports Defendants' motion for summary judgment. Pribyl fails to meet his burden in presenting sufficient evidence to support his claims sufficient to sustain a jury verdict. Accordingly, Defendants' motion for summary judgment should be granted.

## VI.    The Case Against Defendant Willingham Should Be Dismissed

Pursuant to Rule 56(f), the court may enter a judgment independent of the motion for summary judgment. "After giving notice and a reasonable time to respond, the court may . . . consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute." Fed. R. Civ. P. 56(f)(3). The same findings articulated in the discussion above support a judgment that the claim for deliberate indifference to a serious medical need against Defendant Willingham is insupportable. Pribyl alleged in his complaint that Willingham is the one who shut off the water for

five days knowing he had a critical medical condition and that other officers were complicit. The record shows that Pribyl was not denied care for a serious medical need -- he received medical attention and never had hundreds of bleeding skin sores -- and it is implausible that he was denied access to water for that length of time. As narrated above, the material facts are not genuinely in dispute. See Fed. R. Civ. P. 56(e)(2).

Willingham served an answer in this case denying "each and every factual allegation" in the operative complaint referring to her and raised several affirmative defenses including "fail[ure] to state a claim upon which relief may be granted." ECF No. 161, pp. 21-22. There were significant delays in being able to identify Willingham as a defendant. She was served with Plaintiff's operative complaint only **after** the instant motion for summary judgment was filed. Although, Willingham is represented by the same counsel as Pritt and Arnold, no dispositive motion was filed on her behalf. Nonetheless, the court may enter a judgment independent of a dispositive motion under Rule 56(f).

Accordingly, the parties are advised that the court may enter a judgment in Willingham's favor pursuant to Rule 56(f). Pribyl shall have until **August 2, 2022**, to respond to this Report and present genuine material facts that are in dispute as they relate to Willingham. Then, Willingham may file

her reply within **21 days** of Pribyl's response. The failure to present genuine material facts in dispute as to the claims against Defendant Willingham will result in a judgment in her favor.

## VII. The Case Against Defendant Coil Should Be Dismissed Pursuant to Fed. R. Civ. P. 4(m).

Aside from the motion for summary judgment, a procedural matter remains unresolved. Pribyl initiated this case nearly four years ago. ECF No. 1. The court gave Pribyl liberal opportunity to amend; and, after approximately one year, Pribyl finally submitted a legally sufficient complaint. ECF No. 38. As of the date of the drafting of this Re

port, Defendant Coil has not been served with the operative complaint. Federal Rule of Civil Procedure 4(m) provides:

> If a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

The court attempted to serve Coil over a period of nineteen months to no avail. ECF Nos. 58, 102, 115, 127, 146, and 149. See also Order ECF No. 159 explaining the attempts. The court issued an order outlining its efforts to serve Coil and directed Pribyl to provide a service address for Coil

no later than February 28, 2022. ECF No. 159. Failure to do so would result in dismissal for failure to serve in accordance with Fed. R. Civ. P. 4(m). Id. Pribyl submitted a "notice," which only clarified Coil's name. ECF No. 160. Nearly, three years have passed since Plaintiff filed a legally sufficient complaint without service. ECF No. 38. Therefore, the case against Defendant Coil should be dismissed pursuant to Rule 4(m).

## VIII.    Conclusion and Recommendation

It is respectfully **RECOMMENDED** that Defendants' Motion for Summary Judgment be **GRANTED**, in part, and **DENIED**, in part, as follows:

1.    The Defendants' Motion for Summary Judgment on all religious interference claims, deliberate indifference claims, and the official capacity claims be **GRANTED**.

2.    The Defendants' Motion to Dismiss for failure to exhaust administrative remedies be **DENIED**.

3.    The case against Defendant Coil be **DISMISSED** for failure to serve pursuant to Fed. R. Civ. P. 4(m).

4.    Pribyl shall file a response to this Report no later than **August 2, 2022**, demonstrating there are genuine issues of material fact not in dispute to support his claims of deliberate indifference against Defendant Willingham. The failure to do so will result in a judgment in Defendant

Willingham's favor. Defendant Willingham may file a reply within **21 days** of the filing of Pribyl's response.

5.      It is also recommended that, if judgment is entered in favor of all Defendants, that the case be **CLOSED**.

IN CHAMBERS at Tallahassee, Florida, on July 12, 2022.

**s/ Martin A. Fitzpatrick**
**MARTIN A. FITZPATRICK**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations. Fed. R. Civ. P. 72(b)(2). A copy of the objections shall be served upon all other parties. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Fed. R. Civ. P. 72(b)(2). Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control. If a party fails to object to the Magistrate Judge's findings or recommendations as to any particular claim or issue contained in this Report and Recommendation, that party waives the right to challenge on appeal the District Court's order based on the unobjected-to factual and legal conclusions. See 11th Cir. Rule 3-1; 28 U.S.C. § 636(b)(1)(C).